UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


EDMUND GUDENAS,                  )        Case No. 1:09CV2169
                                 )
          Plaintiff,             )
                                 )
     vs.                         )        JUDGE CHRISTOPHER BOYKO
                                 )        (Magistrate Judge McHargh)
BILL CERVENIK, et al.,           )
                                 )
          Defendants.            )        REPORT AND
                                 )        RECOMMENDATION
                                 )

McHARGH, Mag.J.

        The plaintiff Edmund Gudenas ("Gudenas") filed a complaint against

defendants Bill Cervenik, the City of Euclid, Kevin Blakely, Joseph Rodriguez,

Chief James Repicky, Joseph O'Donnell, Charlie Drazetic, Frank Pietravioa, and

John Does Numbers 1 through 6, in the Cuyahoga County (Ohio) Court of Common

Pleas.  (Doc. 1, PX A, Compl.)  The complaint was subsequently removed to this

court.  (Doc. 1.)

        The complaint makes several allegations against the defendants, but does not

enumerate the allegations into discrete claims.  The complaint does allege that

defendants committed violations of Gudenas' constitutional rights which support a

cause of action under 42 U.S.C. § 1983.  (Doc. 1, PX A, at ¶ 35.)  In a later filing,

Gudenas identified the constitutional rights at issue as "his First Amendment right of privacy and his Fourth Amendment right not to have his residence invaded and searched by the government."  (Doc. 13, at 14, citing Compl., at ¶ 33.)

In that regard, the complaint alleged:

> 33.  The above alleged actions and omissions were engaged in under color of law and authority by Defendants and proximately caused the deprivation of Plaintiff's rights secured to him by the Constitution of the United States including, but not limited to, his First Amendment right to privacy, his Fourth Amendment right to be free from the improper entry and search of his residence, and his Fourteenth Amendment right to due process and equal protection of the law in terms of having crimes against him being adequately investigated and in terms of having complaints against city officers and officials being seriously and adequately investigated.

(Doc. 1, PX A, Compl., at ¶ 33.)

The defendants' earlier motion to dismiss was granted in part, and denied in part.  The motion to dismiss was granted as to the right to privacy claim alleged under the First Amendment, and granted as to the failure to investigate claim alleged under the Fourteenth Amendment.  The motion was denied on the Fourth Amendment claim, and denied as to qualified immunity in regard to that claim.  (Doc. 17; see also doc. 16.)

The defendants have filed a motion for summary judgment.  (Doc. 31.) Gudenas has filed a motion in opposition (doc. 39), and the defendants have filed a reply (doc. 40).

## I.  SUMMARY JUDGMENT

Summary judgment is appropriate where the record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a)[1].  Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations that issues of fact may exist.  See Bryant v. Commonwealth of Kentucky, 490 F.2d 1273, 1275 (6th Cir. 1974).  The Supreme Court held that:

> . . . Rule 56(c)[2] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Rule 56 requires the opposing party:

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

Id. at 324.

---

[1]  Civil Rule 56 was totally revised by amendment effective December 2010.  The Committee Note makes it clear that the standard for granting summary judgment remains unchanged.  See, e.g., Diaz v. Mitchell's Salon and Day Spa, Inc., No. 1:09CV882, 2011 WL 379097, at *1 (S.D. Ohio Feb. 2, 2011).  However, the specific language of the Rule has been modified.  Because the motion before the court was filed in October 2010, it is particularly appropriate to rely on earlier precedent.

[2]  Now Rule 56(a).

3

The Sixth Circuit in Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989), has interpreted Celotex and two related cases, Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co., Ltd. v. Zenith Radio, 475 U.S. 574 (1986), as establishing a "new era" of favorable regard for summary judgment motions.  Street points out that the movant has the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. Street, 886 F.2d at 1479.

In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion.  Kraus v. Sobel Corrugated Containers, Inc., 915 F.2d 227, 229 (6th Cir. 1990).

## II.  SECTION 1983 CLAIMS

To prove a claim under 42 U.S.C. § 1983, the plaintiff must identify a right secured by the Constitution or laws of the United States, and the deprivation of that right by a person acting under color of state law.  Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994).

4

A.  Fourth Amendment Violation

The complaint alleges that certain defendants violated Gudenas' Fourth Amendment right to be free from the improper entry and search of his residence. (Doc. 1, PX A, Compl., at ¶ 33.)  A warrantless entry into one's home is presumptively unreasonable under the Fourth Amendment.  Payton v. New York, 445 U.S. 573, 586 (1980); Daughenbaugh v. City of Tiffin, 150 F.3d 594, 603 (6th Cir. 1998).

However, the prohibition against warrantless searches and seizures is not absolute; there are exceptions, for example, in the case of "exigent circumstances." Payton, 445 U.S. at 590.  Generally, exigent circumstances have been found in the following situations:  (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) an immediate risk of danger to the police or others.  Ingram v. City of Columbus, 185 F.3d 579, 587 (6th Cir.1999); United States v. Rohrig, 98 F.3d 1506, 1515 (6th Cir. 1996).  The common thread of cases finding exigent circumstances is the need for prompt action, where the delay to secure a warrant would be unreasonable.  See, e.g., Welsh v. Wisconsin, 466 U.S. 740, 750 (1984) ("urgent need").  In contrast, the government's interest is less compelling in cases involving minor offenses, which is "an important factor to be considered when determining whether any exigency exists." Welsh, 466 U.S. at 753; Ingram, 185 F.3d at 587.[3]

---

[3] An additional consideration is that, where the existence of "exigent circumstances" is arguable, the Sixth Circuit has found that to be a jury question in

The Fourth Amendment prohibition "does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (internal citations omitted).

The complaint alleges that, after several burglaries which were reported to the police, Gudenas provided police with a key for his residence for the sole purpose of installing a burglar alarm, because he was scheduled to be away from home. (Doc. 1, PX A, at ¶¶ 15-17.)  "On or about August 15, 2007, the alarm was installed and verified to be operating properly.  After this time, Defendants had no permission by [Gudenas] or otherwise to enter his residence." Id. at ¶ 16.  The complaint further alleges that on Aug. 16, 2007, defendants Blakely and Rodriguez of the Euclid Police "improperly and without lawful reason entered [Gudenas'] residence along with Defendant O'Donnell of the City of Euclid's building and/or housing department."  (Doc. 1, PX A, at ¶ 17.)

The complaint alleges that the August 16 entry was taken for the purpose of embarrassing Gudenas "due to the condition of the ransacked house." Id.  The complaint continues:

> Specifically, Defendants Blakely, Rodriguez, and O'Donnell used their office and apparent authority to illegally enter [Gudenas'] residence without permission, took photographs of the ransacked house, provided

---

a civil suit.  Ingram, 185 F.3d at 587 (quoting O'Brien v. City of Grand Rapids, 23 F.3d 990, 998 (6th Cir. 1994)).

those photographs to news media, and claimed to file complaints for
violations against [him] for the condition of the house.  The supposed
complaints for violations from Defendants' August 16, 2007, intrusion
were never brought or processed.

(Doc. 1, Compl., PX A, at ¶ 18.)

The complaint thus alleges that defendants were provided a key to his
residence for the sole, limited purpose of installing a burglar alarm.  (Compl., at ¶
15.)  After the alarm was successfully installed on August 15, the defendants had no
further  permission to enter the residence.  Id. at ¶ 16.  The allegation is that
defendants "improperly and without lawful reason" entered the residence on a later
date, without permission and for improper reasons.  Id. at ¶¶ 17-18.

## B.  Violation of City of Euclid Ordinances

In his motion in opposition to the motion for summary judgment, Gudenas
argues that the contested entry on August 16, 2007, "was in violation of his Fourth
Amendment rights and in violation of the City of Euclid's own law on whether the
entry was justified."  (Doc. 39, at 10.)  Gudenas points out that the City of Euclid's
ordinances define "when it is reasonable for its housing department officials to
enter residences."  Id. at 9.

An action under Section 1983 must be premised on an alleged violation of the
U.S. Constitution, or federal law.  Elder v. Holloway, 510 U.S. 510, 515 (1994);
Searcy, 38 F.3d at 286.  An alleged violation of a state or municipal administrative
regulation on its own does not provide a cause of action under Section 1983, nor
does it enter into the qualified immunity analysis.  Elder, 510 U.S. at 515 (citing

7

Davis v. Scherer, 468 U.S. 183, 193-196 (1984)).  The reasonableness of the defendants' actions must be determined under federal Fourth Amendment jurisprudence.

## III.  QUALIFIED IMMUNITY

The defendants argue that the individual defendants are entitled to qualified immunity.  (Doc. 31, at 6-18.)  The issue of qualified immunity must be addressed at the earliest possible point in the litigation.  Pearson v. Callahan, 555 U.S. 223, ___, 129 S.Ct. 808, 815 (2009); Saucier v. Katz, 533 U.S. 194, 200-201 (2001).  The Supreme Court has stated that the inquiry regarding qualified immunity is distinct from the merits of the constitutional claim itself.  Saucier, 533 U.S. at 204; Dunigan v. Noble, 390 F.3d 486, 491 n.5 (6th Cir. 2004).

A government official who is performing a discretionary function is entitled to qualified immunity from suit[4] as long as his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson, 129 S.Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999).  In other words, any "objectively reasonable" action by a state officer, as assessed in the light of clearly established law at the time of the conduct at issue, will be protected by

---

[4] Qualified immunity is an immunity from suit, rather than a mere defense to liability.  Pearson, 129 S.Ct. at 815 ; Saucier, 533 U.S. at 200; Dunigan, 390 F.3d at 490.

qualified immunity.  Painter, 185 F.3d at 567.  Qualified immunity can be defeated if the official "knew or reasonably should have known" that the action he took would violate the constitutional rights of the plaintiff.  Harlow, 457 U.S. at 815.  Qualified immunity is a purely legal question which must be determined early in the proceedings.  Saucier, 533 U.S. at 200; Siegert v. Gilley, 500 U.S. 226, 232 (1991).

The defendants bear the initial burden of coming forward with facts which suggest that they were acting within the scope of their discretionary authority at the time in question.  Rich v. City of Mayfield Heights, 955 F.2d 1092, 1095 (6th Cir. 1992).  (The defendants here have met their initial burden:  it is uncontested that the police officers and other governmental defendants were acting in their official capacities.)

The burden then shifts to Gudenas.  The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity.  Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir. 2005); Cartwright v. City of Marine City, 336 F.3d 487, 490-491 (6th Cir. 2003) (citing Rich, 955 F.2d at 1095); Hamilton v. Myers, 281 F.3d 520, 531 (6th Cir. 2002).  Upon the assertion of qualified immunity, the plaintiffs must put forward "specific, nonclusory factual allegations" that would defeat the immunity.  Siegert, 500 U.S. at 236 (Kennedy, J., concurring).

The Supreme Court recently held that the "two-step sequence" previously required by Saucier v. Katz "should no longer be regarded as mandatory," and that district courts have discretion in "deciding which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S.Ct. at 818. The two factors which are relevant to demonstrate whether or not the defendants are entitled to qualified immunity from suit are "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Pearson, 129 S.Ct. at 815-816 (internal citations omitted); see also Saucier, 533 U.S. at 201.

Whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a general broad proposition." Saucier, 533 U.S. at 201. The relevant inquiry in determining whether a right is clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau v. Haugen, 543 U.S. 194, 199 (2004); Saucier, 533 U.S. at 202. If the law does not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. Saucier, 533 U.S. at 201. See also Pearson, 129 S.Ct. at 816 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

"In other words, where a constitutional violation exists, an officer's personal liability turns on the 'objective legal reasonableness' of the action in view of the circumstances the officer confronted assessed in light of 'clearly established' legal rules." Dunigan, 390 F.3d at 491 (citing Saucier, 533 U.S. at 202; Anderson, 483 U.S. at 639).

10

"The right of individuals to be free from unreasonable and warrantless searches is a clearly established constitutional right." Daughenbaugh,150 F.3d at 603. As discussed earlier, absent exigent circumstances, "warrantless searches are presumptively unreasonable." Id. (quoting Horton v. California, 496 U.S. 128, 133, (1990)). The factual allegations of the complaint are that permission to enter was limited (to the initial installation of the alarm on Aug. 15), and that the subsequent improper entry on Aug. 16 was made without a warrant, and without exigent circumstances. (Doc. 1, PX A, compl., at ¶¶ 15-17.)

## IV. DEFENDANTS' MOTION AS TO BLAKELEY, RODRIGUEZ AND O'DONNELL

The defendants argue that, although the search of the Gudenas residence was conducted without a warrant, it was reasonable under the Fourth Amendment and did not violate his constitutional rights. Sgt. Blakeley, Det. Rodriguez, and Inspector O'Donnell claim they are entitled to qualified immunity under several theories. First, they entered the Gudenas residence with his consent. (Doc. 31, at 8-9; doc. 40, at 7-8.) Second, by providing a key to the police, Gudenas lost any reasonable expectation of privacy in his residence. (Doc. 31, at 9-11; doc. 40, at 8.) Third, the housing violations observed by these three defendants were in plain view. (Doc. 31, at 11-12; doc. 40, at 9.) Finally, the housing violations present in the residence created exigent circumstances that justified a warrantless search. (Doc. 31, at 12-13; doc. 40, at 10.)

11

In addition, the defendants argue that even if there were any violations of a Fourth Amendment right, that right was not clearly established on the date in question.  (Doc. 31, at 13-14.)

## A.  Consent to Enter?

There is no Fourth Amendment violation for a warrantless entry where voluntary consent has been obtained from the individual whose property is entered.  Illinois v. Rodriguez, 497 U.S. at 181; United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999); Mullane v. Kassinger, 107 F.Supp.2d 877, 880 (N.D. Ohio 2000).  The existence of consent is not to be lightly inferred.  United States v. Shaibu, 920 F.2d 1423, 1426 (9th Cir. 1990); Mullane, 107 F.Supp.2d at 881 (quoting Simmons v. Bomar, 349 F.2d 365, 366 (6th Cir. 1965)).  In the Sixth Circuit, "only in a rare and atypical situation will consent be merely implied or inferred."  Mullane, 107 F.Supp.2d at 882.

The government bears the burden to establish the existence of consent, and that burden is heaviest when consent would be inferred to enter a home.  Shaibu, 920 F.2d at 1426 (citing Payton, 445 U.S. at 589-590); see also Worley, 193 F.3d at 385; United States v. Escobar, 389 F.3d 781, 785 (8th Cir. 2004) (government bears burden on consent); United States v. Erwin, 155 F.3d 818, 823 (6th Cir. 1998), cert. denied, 525 U.S. 1123 (1999) (same).

The existence of consent is "a question of fact to be determined from the totality of all the circumstances."  Worley, 193 F.3d at 384; Erwin, 155 F.3d at 823

12

(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)); Mullane, 107 F.Supp.2d at 880. "[C]onsent must be proved by clear and positive testimony, and, to be voluntary it must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." Erwin, 155 F.3d at 823 (quoting United States v. Scott, 578 F.2d 1186, 1188-1189 (6th Cir. 1978)); see also United States v. Valdez-Ruiz, No. 02-5942, 2003 WL 22734916, at *2 (6th Cir. Nov. 13, 2003) (quoting Erwin); Mullane, 107 F.Supp.2d at 880. There is no question of duress or coercion in this case; rather, the contested question is the specific nature and scope of the consent.

Once an individual provides consent, "[t]he standard for measuring the scope of [that] consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" United States v. Purcell, 526 F.3d 953, 962 (6th Cir. 2008) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)); United States v. Gant, 112 F.3d 239, 242 (6th Cir. 1997). Under this test,

> . . . the assessment of objective reasonableness is made as of the time of the conversation between the consenting party and the police. Consequently, information that comes to the police after the consent has been given will not affect the validity or scope of the consent, unless, of course, the party withdraws his or her consent.

United States v. Caudill, No. 00-5621, 2001 WL 1671075, at *4 (6th Cir. Dec. 28, 2001). See also Worley, 193 F.3d at 386 (court must examine content of statement to ensure specific nature of consent).

13

It is undisputed that Gudenas gave his consent for entry on August 15, 2007, for purposes of installing the alarm.  The subsequent entry on August 16 is the subject of the dispute.

The defendants contend that there is no dispute that Gudenas requested the alarm to be installed into his residence because of repeated burglaries within the span of a few weeks.  (Doc. 31, at 9.)  They also claim that Gudenas provided the Euclid Police Department with a key to his residence to install the alarm, because he was going to be out of town at the time of the installation, and "for the purpose of responding to the alarm."  (Doc. 31, at 9, citing Gudenas dep., at 36-37.)

Therefore, Sgt. Blakeley, Det. Rodriguez, and Inspector O'Donnell assert they reasonably understood the scope of the consent "to include entering the residence to ensure that the alarm was working properly."  (Doc. 31, at 8-9.)

Gudenas responds that he never had a conversation with these particular defendants concerning the entry to his home.  (Doc. 39, at 17.)  Gudenas argues that there was no voluntary consent by him for defendants Blakeley, Rodriguez, or O'Donnell to enter his residence on Aug. 16, 2007.  Id.

It is uncontested that after the first and second break-ins to his residence, Gudenas requested greater surveillance and attention to his residence.  Gudenas had a business on Middle Bass Island, which frequently led to his absence from his residence in the City of Euclid for days at a time.  Gudenas became concerned that this greater attention was not occurring, and requested that a burglar alarm be installed in his residence.  At this time, the City of Euclid had a program which

14

installed alarms in vacant or abandoned residences in response to an increase in break-ins.  After the third reported burglary on Aug. 12, 2007, arrangements were made between Gudenas and Det. Kucinski to install an alarm.

When an installation date was selected (Aug. 15, 2007), Gudenas could not be present because he had to catch the ferry to Middle Bass Island at that time. Therefore, he made arrangements with Det. Kucinski to have a duplicate key to his residence made, so that the alarm could be installed without Gudenas being present.

The defendants argue that "Detective Kucinski understood the consent to include being able to respond to alarm malfunctions."  (Doc. 40, at 7, 12, citing his deposition testimony.)  On this issue, Kucinski testified as follows:

> Q.  . . . And your understanding was that he provided the key really to install the alarm?
>
> A.  No.  Well, to install the alarm, but we would also need a key to get into the house should the alarm go off, should there be a malfunction. Should there be a burglary, we would have to get into the house to do a search of it.

(Doc. 26, Kucinski dep., at 7.)

As to the scope of his consent, Gudenas testified as follows:

> A.  . . . And I told him this key, please make sure no one else gets it. This key is only to install the alarm.  No other purpose.
>
> Q.  And you were very specific about that?
>
> A.  Yes.
>
> * * * * * *

15

A.  . . . But he said he would – you know, it would be in the detective
bureau, you know, and that — he did imply to me that if the alarm
went off, there was a burglary in progress, the police department,
instead of crawling through a window, would probably use the key to
gain entrance into the home if there was an emergency.

Q.  What about if there was a problem with the alarm?

A.  A problem with the alarm was not discussed.  The only thing we
discussed was installing the alarm and if the alarm — if there was a
burglary in progress.

(Doc. 29, Gudenas dep., at 37-38.)

Upon questioning as to whether Gudenas specifically told Det. Kucinski that

he would need to contact Gudenas if there was a malfunction, Kucinski testified:

Q.  . . . Do you recall if you discussed with him whether you'd enter if
there were malfunctions to the alarm?

A.  I don't really recall if I had that conversation.

(Doc. 26, Kucinski dep., at 8.)

The deposition testimony establishes a common understanding between

Gudenas and Det. Kucinski, that the primary purpose behind Gudenas providing a

key to the detective was to install the alarm.  (Doc. 26, Kucinski dep., at 7; doc. 29,

Gudenas dep., at 37.)  There was also a common understanding that the police

might use the key to enter the residence if the alarm showed there was a burglary

in progress.  (Doc. 26, Kucinski dep., at 7; doc. 29, Gudenas dep., at 37-38.)

Gudenas testified that an entry based "a problem with the alarm" was not

discussed.  (Doc. 29, Gudenas dep., at 38.)  Det. Kucinski does not contradict

Gudenas' recollection, simply stating that he did not recall whether they discussed

16

whether the police could enter if there were malfunctions to the alarm.  (Doc. 26, Kucinski dep., at 8.)

What would the typical reasonable person have understood to be the scope of the consent to enter, in light of the exchange between Gudenas and Det. Kucinski? There is no question that the primary purpose of the consent was for the installation of the alarm.  It logically follows that, after the installation of the alarm, there would be consent for the police to enter the residence to investigate a possible burglary if the alarm was triggered.  (Otherwise, the installation of the alarm would serve no purpose.)  Gudenas accepted the possibility that the police might utilize the key to investigate a possible break-in, if the alarm had been triggered.  (Doc. 29, Gudenas dep., at 37-38.)

The defendants argue that the consent to enter should include the Aug. 16 entry to reset the alarm.  That day, Sgt. Blakeley learned that the alarm was in test mode.  (Doc. 27, Blakeley dep., at 8-11, 22.)  Blakely called Housing Inspector O'Donnell that morning to notify him that they would be going back to reset the alarm.  Id. at 29.  O'Donnell testified that he entered the residence on August 16 with Sgt. Blakeley because they "had been working together on the alarm systems and we were going to reset the alarm."  (Doc. 28, O'Donnell dep., at 13.)

The court finds that it was reasonable for the defendants to assume that they had implied consent to enter the residence to reset the alarm.  Gudenas' consent to enter for purposes of installing the alarm reasonably extended to ensuring that the alarm was functioning properly.

17

However, the scope of the implied consent determines the permissible scope of the defendants' activities within the home.  Their entry was limited in scope to what is reasonably covered by the consent given.  Purcell, 526 F.3d at 962; Gant, 112 F.3d at 242 (citing Jimeno, 500 U.S. at 251).  See generally Walter v. United States, 447 U.S. 649, 656-657 (1980) (scope of search limited by terms of authorization).  The defendants entered the residence with implied consent for the limited purpose of resetting the alarm; they did not have consent to roam through the house for any other purpose.  See, e.g., doc. 38, Rodriguez dep., at 15 (after entry, defendants "were all walking around").  The court will address their actions after the entry in the sections following.

## B.  Exigent Circumstances

The defendants also claim that the housing violations present in the Gudenas residence created exigent circumstances that justified a warrantless entry and search.  (Doc. 31, at 12-13.)

The Fourth Amendment prohibition against warrantless entries has exceptions in the case of "exigent circumstances."  Payton, 445 U.S. at 590.  As mentioned earlier, exigent circumstances have been found in the following situations:  (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) an immediate risk of danger to the police or others.  Ingram, 185 F.3d at 587; Rohrig, 98 F.3d at 1515.  The common thread of cases finding exigent circumstances is the need for prompt action,

18

where delay in securing a warrant would be unreasonable.  See, e.g., Welsh, 466
U.S. at 750 ("urgent need").  In contrast, the government's interest is less
compelling in cases involving minor offenses, which is "an important factor to be
considered when determining whether any exigency exists."  Welsh, 466 U.S. at
753; Ingram, 185 F.3d at 587.

The defendants claim that "the facts of this case are very similar to the facts"
in Capozzi v. City of Olean.  In Capozzi, the police entered the residence of an
elderly man who had not been seen in almost two weeks.  Capozzi v. City of Olean,
910 F.Supp. 900, 904 (W.D. N.Y. 1995).  There was no response to knocks at the
door, and city officials forced the door open.  The district court found the entry came
within the emergency exception which allows a warrantless entry when the police
reasonably believe that a person is in need of immediate aid.  Capozzi, 910 F.Supp.
at 907 (citing Mincey v. Arizona, 437 U.S. 385, 392-393 (1978)).  The court noted
that an entry made under this exception "must be limited by the emergency that
necessitated it."  Id.

> Once properly inside,
>
> The officers noted that at the time of entry there was no heat in the
> building, despite the very cold December temperatures.  The only heat
> apparently was coming from one burner on a kitchen range where a
> large pot of water was heating.  Captain Melfi stated that the interior
> of the home was in "terrible condition," that articles of "everything
> imaginable," was piled from floor to ceiling, that the ceiling was
> collapsing in the kitchen because of water leaking after a tree fell on
> the structure, damaging the roof, and that the stove was packed full of
> papers, articles of clothing, and other items.

Capozzi, 910 F.Supp. at 905 (internal citations omitted).

19

A housing inspector was then summoned, entered at the request of the police, inspected the building "and deemed it to be dangerous, later posting a sign on the exterior which characterized the structure as a 'dangerous building'." Capozzi, 910 F.Supp. at 905. The court found it was reasonable for the inspector to enter the house after the police had lawfully entered, "in order to determine whether the structure was too dangerous for habitation." Id.

The defendants assert that the Aug. 12, 2007, housing report provided to Housing Manager Drazetic:

> . . . indicated that there was a black substance overflowing the toilet and that the walls of the foundation of the home were caving in. These conditions, if true, would have created an emergency situation that would need to be addressed immediately in order to prevent illness and/or death.

(Doc. 31, at 13, citing DX 3.)

The Aug. 12 report cited is not a housing report, but actually the incident report prepared by the Euclid Police on that day concerning the burglary reported. (Doc. 31, DX 3, at 2-4.) The report notes the general disarray in the residence, and states: "There are places in the basement where the wall[5] is caving in. The bathroom going down to the basement has a black unknown substance overflowing out of it." Id. at 3.

Gudenas responds that the "exigent circumstances" exception is based on "immediacy, and the need for prompt action, which make the time needed to obtain

---

[5] Actually, the basement paneling was merely damaged; the foundation was not caving in. See, e.g., doc. 25, Drazetic dep., at 27.

20

a warrant unreasonable." (Doc. 39, at 16, citing Welsh, 466 U.S. at 750, and other cases.)

Gudenas argues that there was no effort by Euclid's housing department to contact the owner of the property or Mr. Gudenas before entering without a warrant on August 16, 2007.  He notes that the housing department was not denied entry, nor was any complaint issued by the housing department, before that date. He contends that there is no documentation supporting the allegation that his home "presented a serious health and safety concern, was uninhabitable, or presented an emergency prior to the entry without a warrant on August 16, 2007." (Doc. 39, at 12.)

Sgt. Blakeley testified that he learned on the morning of Aug. 16 that the alarm was in test mode, after receiving a call from Dennis Ginley of Pro-Tech.  (Doc. 27, Blakeley dep., at 8-11, 22.)  Blakely called Housing Inspector O'Donnell that morning because "[t]he Housing Department was interested in getting into this rental property."  Id. at 29.  Blakeley's understanding was that the alarm installation "was either done incorrectly or they were having problems and stuck in test mode."  Id.  He stated:  "So on the 16th, I notified Joe [O'Donnell] that we would be going back to reset it on Charlie [Drazetic]'s request."  Id.  Blakeley allowed O'Donnell to enter the house with him and Det. Rodriguez.  Id. at 40, 52.

Det. Rodriguez provided the key to enter the residence, because Blakeley did not have access to the key.  (Doc. 38, Rodriguez dep., at 7, 25-26.)  O'Donnell testified that he entered the residence on August 16 with Sgt. Blakeley because

21

they "had been working together on the alarm systems and we were going to reset the alarm." (Doc. 28, O'Donnell dep., at 13.)  However, Rodriguez testified that he believed that he and Blakeley could have dealt with the alarm without O'Donnell being there. (Doc. 38, Rodriguez dep., at 17-18, 19-20.)

The other reason for O'Donnell's entry was "[t]o document complaints that were received from my boss [Drazetic] about the condition of the premises." (Doc. 28, O'Donnell dep., at 14; see also doc. 25, Drazetic dep., at 9, 18.)  Drazetic had told him the evening before the entry "about the feces overflowing in one of the toilets in the premises." Id. at 14-15; see also id. at 43-44.  Drazetic told him "if the opportunity presented itself to document what I would see if I went into the premises, if it happened to come up." Id. at 16.  No one told O'Donnell that the conditions in the house constituted an emergency condition. Id. at 20, 42.  As far as O'Donnell knew, Drazetic never declared an emergency. Id. at 20; see also doc. 25, Drazetic dep., at 24-25; doc. 38, Rodriguez dep., at 23-24.

O'Donnell testified that the police were going to enter the Gudenas residence on Aug. 16 to reset the alarm. (Doc. 28, O'Donnell dep., at 15.)  O'Donnell was not aware of any issue concerning the alarm on the day before the entry. Id. at 15.  He learned about the alarm on the 16th. Id. at 18.

O'Donnell testified that he needed to enter with the police, and he "would have no reason to go in other than to go in with the police to reset the alarm." (Doc. 28, O'Donnell dep., at 19; see also doc. 25, Drazetic dep., at 8-9 (primary reason to enter was to reset alarm.))  Blakeley told him that the alarm was in test mode, and

22

O'Donnell reset the alarm when they had entered the residence.  Id. at 19-20, 54-55. He does not recall whether the alarm was actually in test mode when he reset it; the alarm "might have been" working fine when they entered.  Id. at 20.

O'Donnell testified that he made no attempt to get a warrant to enter.  (Doc. 28, O'Donnell dep., at 17, 42; see also doc. 25, Drazetic dep., at 9, 29.)  Nor had he contacted Gudenas, or the property owner, about entering his house.  Id. at 13, 60; see also doc. 25, Drazetic dep., at 12, 28-29.  Once the defendants entered the house, they "were all walking around."  (Doc. 38, Rodriguez dep., at 15.)  O'Donnell took photographs.  (Doc. 28, O'Donnell dep., at 12, 55.)

O'Donnell was told to do an inspection report concerning the entry by Drazetic, and he completed that report on August 21.  (Doc. 28, O'Donnell dep., at 44.)  He did not complete the report immediately after the entry because "it was a sensitive situation" since Gudenas was city council president at the time, and was running for mayor.  Id. at 44-45.  The report was not sent to the property owner, Coastline Investments, at that time.  Id. at 46.  Normally, it would have been O'Donnell's job to send the report to the property owner, but Drazetic told him how to proceed in this case.  Id. at 46-47.

There was a second inspection report, dated August 30, 2007, which was provided to the property owner.  (Doc. 28, O'Donnell dep., at 48-49.)  O'Donnell went back to the property a second time, with the Board of Health.  Id. at 49.  The Aug. 30 report informed the owner that they had 90 days to correct the problems.  Id.  It does not declare that there is an emergency situation, or that there has to be an

23

immediate vacation of the premises. (Doc. 28, O'Donnell dep., at 49; see also doc. 25, Drazetic dep., at 27.)

The primary reason to enter the Gudenas residence was to reset the alarm, which was in test mode.[6] Sgt. Blakeley entered the residence for this purpose, accompanied by Det. Rodriguez, who had custody of the key to the home. There is testimony that the presence of Housing Inspector O'Donnell to accomplish this task was not required.

The housing department did not declare the conditions in the residence to constitute a dangerous emergency, either before the Aug. 16 entry or after, such that an immediate warrantless entry was required. Drazetic had directed O'Donnell that, "if the opportunity presented itself," he should enter the Gudenas residence to investigate the conditions. This does not imply any urgency. See generally doc. 25, Drazetic dep., at 37. The defendants have presented no justification for their failure to simply attempt to obtain permission from Gudenas or the property owner to enter, or to follow ordinary procedures for obtaining a warrant for a housing inspection.

The evidence before the court does not support a finding that the warrantless entry was supported by exigent circumstances; specifically, there is no showing of an immediate risk of danger, as argued by defendants. See, e.g., Ingram, 185 F.3d

---

[6] Thus, even if these defendants had implied consent to enter the premises to reset the alarm, the scope of that implied consent would extend no further than to the immediate area where the alarm was located. See generally Caudill, 2001 WL 1671075, at *4; Worley, 193 F.3d at 386.

at 587; Rohrig, 98 F.3d at 1515.  There is no showing that there was a need for prompt action, where delay in securing a warrant would be unreasonable.  See, e.g., Welsh, 466 U.S. at 750 ("urgent need").

However, as discussed earlier, it was reasonable for the defendants to assume that they had implied consent to enter the residence to reset the alarm, thus the defendants did not enter the home in violation of the Fourth Amendment.  The court will address the defendants' subsequent actions, after their entry into the home, in the following sections.

### C.  Reasonable Expectation of Privacy

The defendants also contend that, by providing a key to the police to facilitate the installation of the alarm, Gudenas lost any reasonable expectation of privacy in his residence.  (Doc. 31, at 9-11.)  The defendants assert that:  "An individual's reasonable expectation of privacy is fatally compromised when the individual invites a government agent or confidential informant into his residence."  (Doc. 31, at 9, citing United States v. Paul, 808 F.2d 645, 648 (7th Cir. 1986).)

The Fourth Amendment protects a person's reasonable expectation of privacy, that is, those expectations of privacy that society is prepared to recognize as "reasonable."  Oliver v. United States, 466 U.S. 170, 177 (1984) (citing Katz v. United States, 389 U.S. 347 (1967)).  The Supreme Court has recognized "our societal understanding that certain areas deserve the most scrupulous protection from government invasion."  Id. at 178 (citing Payton, 445 U.S. 573).  "At the core of

25

the Fourth Amendment . . . is the fundamental concept that any governmental intrusion into an individual's home or expectation of privacy must be strictly circumscribed . . . [thus,] the necessity of prior judicial approval should control any contemplated entry, regardless of the purpose for which that entry is sought." Payton, 445 U.S. at 582 n.17.

The Seventh Circuit in Paul approved the "consent-once-removed" doctrine in a case involving the consensual entry of a confidential informant.  Paul, 808 F.2d at 648 (privacy of the home fatally compromised when owner admits confidential informant and proudly displays contraband to him); see also Pearson, 129 S.Ct. at 822-823; United States v. Yoon, 398 F.3d 802, 808 (6th Cir.), cert. denied, 546 U.S. 977 (2005).  The Supreme Court later found that qualified immunity could be granted to officers who relied on the "consent-once-removed" line of cases, even though their own federal circuit had not yet ruled on the doctrine.  Pearson, 129 S.Ct. at 823.  Paul and related cases rely on a consensual entry, and are not applicable under the circumstances of this case, which relies on implied consent.

Assuming the defendants had implied consent to enter the premises to reset the alarm, the scope of that implied consent would extend no further than to the area where the alarm was located.  See generally Caudill, 2001 WL 1671075, at *4; Worley, 193 F.3d at 386.  Even in those cases where a person has a reduced expectation of privacy, the official must still have a "lawful right of access" to the specific area searched.  Rice v. Gercar, No. 95-3418, 1996 WL 67907, at *3 (6th Cir.

26

Feb. 15, 1996) (citing Horton, 496 U.S. at 137.)  Gudenas would not lose the

reasonable expectation of privacy as to the remainder of his home.


### D.  Plain View

Finally, the defendants note that the "plain view doctrine" is an exception to

the general rule that warrantless searches are presumptively unreasonable.  (Doc.

31, at 11, citing Horton, 496 U.S. at 133.)  The "plain view" issue most often arises

in connection with a motion to suppress evidence.  See, e.g., Horton, 496 U.S. at

131; United States v. Taylor, 248 F.3d 506, 511 (6th Cir.), cert. denied, 534 U.S. 981

(2001).  The Fourth Amendment issue in dispute in such cases is generally an

allegedly unconstitutional seizure.  No such seizure is at issue here.

The defendants contend that the housing violations were in plain view, and

that Sgt. Blakeley testified that the conditions "beat you over the head as soon as

you walked in there."  (Doc. 31, at 11, quoting doc. 27, Blakeley dep., at 53.)

Blakeley observed stairs giving way, feces overflowing the toilet, and black mold

eating the furniture in the basement.  Id.  Consequently, defendants argue, "even if

the scope of the Plaintiff's consent was limited to setting and attending to the

burglar alarm, once inside the residence the housing violations were in plain view,

enabling Inspector O'Donnell to conduct his partial investigation and to document

the conditions inside the residence."  Id. at 11-12.

As the Supreme Court has stated:  "What the 'plain view' cases have in

common is that the police officer in each of them had a prior justification for an

intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." Coolidge v. New Hampshire, 403 U.S. 443 (1971); Horton, 496 U.S. at 135. The Court stressed that it is "an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." Horton, 496 U.S. at 136.

> The Sixth Circuit as well states:
>
> The plain view exception to the warrant requirement applies when (1) the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed, (2) the item is in plain view, and (3) the incriminating character of the evidence is immediately apparent.

Taylor, 248 F.3d at 512 (citing Horton, 496 U.S. at 136). In Taylor, for example, the officers were legitimately present in the living room at the defendant's invitation Id. See also El Bey v. Roop, 530 F.3d 407, 421-422 (6th Cir. 2008) (citing cases) (plain view exception cannot excuse otherwise unconstitutional search); Shamaeizadeh v. Cunigan, 338 F.3d 535, 550 (6th Cir. 2003).

In other words, the plain view doctrine cannot provide support for an unconstitutional entry, or the officer's physical presence in an area beyond the scope of consent to their entry. Here, the court has already determined that the defendants' entry was not unconstitutional. Thus, the defendants were legitimately present in the house. Sgt. Blakeley testified that the condition of the house "was painfully obvious . . . as soon as you walked in there." (Doc. 27, Blakeley dep., at

28

53.)  While the implied consent was limited to the entry to reset the alarm, Blakeley has testified that the conditions were in plain view upon the defendants' entry.  Id.

Gudenas has not contested or refuted this evidence.  He states that the condition of the house was unknown to Blakeley and O'Donnell before they entered the house.  He then states that "Defendants' claim that the condition of the house was in plain view to the Defendants who entered is without merit."  (Doc. 39, at 17.)  But the defendants are not arguing the conditions were in plain view before they entered; they are claiming that the conditions were in plain view upon their entry.  The defendants were legitimately present in the house, and had a lawful right of access, when they made this observation.  See generally  Horton, 496 U.S. at 136; Taylor, 248 F.3d at 512.  Even if the defendants were mistaken as to the extent of the dangerousness of the conditions, their reasonable, but mistaken, beliefs as to the facts would not defeat qualified immunity.  Saucier, 533 U.S. at 206.


### E.  Summary

A warrantless entry into one's home is presumptively unreasonable under the Fourth Amendment.  Payton, 445 U.S. at 586; Daughenbaugh, 150 F.3d at 603.  It is uncontested that the defendants did not have a warrant to support an entry into the Gudenas home, therefore the entry is presumed to violate the Fourth Amendment.

29

There is an exception to the Fourth Amendment prohibition  in the case of "exigent circumstances."  Payton, 445 U.S. at 590.  The common thread of cases finding exigent circumstances is the need for prompt action, where delay in securing a warrant would be unreasonable.  Welsh, 466 U.S. at 750 ("urgent need").

The Fourth Amendment prohibition does not apply, as well, to those situations in which voluntary consent has been obtained.  Rodriguez, 497 U.S. at 181.  The government bears the burden to establish the existence of consent, and their burden is heaviest when consent would be inferred to enter a home.  Shaibu, 920 F.2d at 1426 (citing Payton, 445 U.S. at 589-590); see also Worley, 193 F.3d at 385; Escobar, 389 F.3d at 785; Erwin, 155 F.3d at 823.  If an individual provides consent, the standard for measuring the scope of that consent is objective reasonableness, in other words, what would a reasonable person have understood by the exchange between the officer and the individual.  Purcell,  526 F.3d at 962 (quoting Jimeno, 500 U.S. at 251; Gant, 112 F.3d at 242.  The assessment of objective reasonableness is made as of the time of the conversation between the consenting party and the police.  Caudill, 2001 WL 1671075, at *4.

The defendants argue that they are entitled to qualified immunity for their warrantless entry into the Gudenas residence, under several of the exceptions noted above.

The court finds that the defendants entered the residence with implied consent for the purpose of resetting the alarm.  Even if the defendants had implied consent to enter the premises to reset the alarm, however, the scope of that implied

30

consent would ordinarily extend no further than to the area where the alarm was located.  See generally Caudill, 2001 WL 1671075, at *4; Worley, 193 F.3d at 386. Gudenas would not lose the reasonable expectation of privacy as to the remainder of his home.

In this case, however, the defendants observed possibly dangerous housing violations in plain view upon their entry to the residence.  The defendants were legitimately present in the house, and had a lawful right of access, when they made this observation.  See generally  Horton, 496 U.S. at 136; Taylor, 248 F.3d at 512. The court finds that Gudenas has not carried his burden of proof to show that these defendants are not entitled to qualified immunity.

## V.  DEFENDANTS' MOTION AS TO PIETRAVOIA, DRAZETIC, REPICKY AND CERVENIK

The defendants also argue that Pietravoia, Drazetic, Repicky and Cervenik are entitled to qualified immunity and summary judgment.  (Doc. 31, at 17-18.) They point out that there is no dispute that none of these defendants entered the Gudenas residence on August 15 or 16, 2007.  Id. at 17.  They contend that "there is no doubt that these Defendants did not have any direct involvement in the constitutional violations" alleged.  Id.  They assert that Gudenas is suing them based solely on their role(s) as supervisors.

Respondeat superior is not available as a basis of recovery under Section 1983. Monell v. Department of Social Serv. of the City of New York, 436 U.S. 658,

691 (1978); McQueen v. Beecher Community Schools, 433 F.3d 460, 470 (6th Cir. 2006); Leary v. Daeschner, 349 F.3d 888, 903 (6th Cir. 2003).  Supervisor liability is only appropriate where the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it," or at least implicitly authorized or knowingly acquiesced in the unconstitutional conduct of the offender. Everson v. Leis, 556 F.3d 484, 495 (6th Cir. 2009); McQueen, 433 F.3d at 470; Leary, 349 F.3d at 903.  Moreover, in enacting Section 1983, "Congress did not intend municipalities [or other government bodies] to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." Monell, 436 U.S. at 691.

Gudenas does not address the defendants' arguments as to Pietravoia, Repicky and Cervenik, and thus summary judgment should be granted to these defendants as unopposed.  See generally doc. 39.

As to Drazetic, Gudenas does not specifically address the respondeat superior argument per se.  However, he does argue, for example, that "Defendants Blakeley, O'Donnell, Rodriguez, and Drazetic are only entitled to immunity if their 'conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Doc. 39, at 8.)

Gudenas argues that "Defendant Drazetic directed Defendant O'Donnell to go to Mr. Gudenas' house with the City's Police Department to investigate its conditions." (Doc. 39, at 11, citing Drazetic dep., at 16-17.)  Drazetic told O'Donnell

32

"if the opportunity presented itself to document what [he] would see if [he] went into the [Gudenas] premises."  (Doc. 39, at 12, quoting O'Donnell dep., at 16.)

While there is no question the Drazetic had some involvement in the events, it is less than clear that he "encouraged the specific incident of misconduct or in some other way directly participated in it," or implicitly authorized or knowingly acquiesced in the allegedly unconstitutional conduct.  McQueen, 433 F.3d at 470; Leary, 349 F.3d at 903.

Sgt. Blakeley testified that his understanding was that the alarm installation was somehow faulty, and he notified Housing Inspector O'Donnell on the 16th that they would be going back to reset it at Drazetic's request.  (Doc. 27, Blakeley dep., at 29.)  There is no testimony as to whether Drazetic told them anything with regard to getting, or not getting, a warrant to enter the premises.

According to O'Donnell's deposition testimony, Drazetic told him on the 15th that "if the opportunity presented itself to document what I would see if I went into the premises, if it happened to come up."  (Doc. 28, O'Donnell dep., at 16.)  There is no further evidence elucidating this instruction, specifically, what was meant by, "if the opportunity presented itself."  It is unclear whether Drazetic expected O'Donnell to obtain a warrant (or not), or to visit the premises and obtain consent to enter if he happened to be in the neighborhood, or to tag along when the police entered to reset the alarm.

The burden is on Gudenas to show that Drazetic is not entitled to qualified immunity.  Untalan, 430 F.3d at 314; Cartwright, 336 F.3d at 490-491.  Gudenas

33

has the burden to put forward "specific, nonconclusory factual allegations" that would defeat the assertion of qualified immunity.  Siegert, 500 U.S. at 236 (Kennedy, J., concurring).  More generally, it is Gudenas' burden to demonstrate that there is a genuine dispute as to any material fact concerning Drazetic's liability.  Gudenas has not done so.

Summary judgment should be granted to defendants Pietravoia, Repicky and Cervenik as unopposed.  Summary judgment should be granted to defendant Drazetic because Gudenas has failed to demonstrate that he encouraged the specific misconduct (here, the allegedly unconstitutional entry), or directly participated in it, or implicitly authorized or knowingly acquiesced in the allegedly unconstitutional conduct.  Respondeat superior alone cannot be a basis of recovery under Section 1983.


## VI.  DEFENDANTS' MOTION AS TO CITY OF EUCLID

Finally, the defendants contend that the City of Euclid is entitled to summary judgment.  They point out that the city would not be liable if there was no constitutional injury suffered by the plaintiff.  (Doc. 31, at 18, citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).)

Gudenas does not address the defendants' arguments as to the City of Euclid, and thus summary judgment should be granted to the City as unopposed.  See generally doc. 39.

34

## VII.  SUMMARY

The defendants' motion for summary judgment (doc. 31) should be granted.

Summary judgment should be granted to defendants Blakeley, Rodriguez, and O'Donnell because they are entitled to qualified immunity, and Gudenas has not carried his burden of proof to show that these defendants are not entitled to qualified immunity.  These three defendants entered his residence with implied consent, and explored beyond the scope of the consent because they encountered possibly hazardous housing conditions in plain view.

Summary judgment should be granted to defendants Pietravoia, Repicky, Cervenik, and the City of Euclid as unopposed.

Summary judgment should be granted to defendant Drazetic because Gudenas has failed to demonstrate that he encouraged the specific  misconduct (here, the allegedly unconstitutional entry), or directly participated in it, or implicitly authorized or knowingly acquiesced in the allegedly unconstitutional conduct.

35

<u>RECOMMENDATION</u>

It is recommended that the motion for summary judgment (doc. 31) be granted, as discussed above.


Dated:  Mar. 22, 2011              /s/ Kenneth S. McHargh
                                   Kenneth S. McHargh
                                   United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).